# GREAT NORTHERN OIL COMPANY v. ST. PAUL FIRE AND MARINE INSURANCE COMPANY AND OTHERS.

189 N. W. (2d) 404.

August 13, 1971—No. 42757.

*Meagher, Geer, Markham & Anderson, Mary Jeanne Coyne,* and *O. C. Adamson II,* and *William D. Flaskamp,* for appellants.

*O'Connor, Green, Thomas, Walters & Kelly, Joe A. Walters,* and *L. T. Merrigan,* for respondent.

Heard before Knutson, C. J., and Murphy, Rogosheske, Peterson, and Rolloff, JJ.

ROGOSHESKE, JUSTICE.

Defendant insurance companies appeal from an order striking a defense from their joint answer.[1]

---

[1] Because the order removes with finality one of the defenses asserted to plaintiff's claim, it is appealable of right as an "order involving the merits of the action or some part thereof." Rule 103.03 (d), Rules of Civil Appellate Procedure; Lowe v. Nixon, 170 Minn. 391, 212 N. W. 896.

The issue presented is whether plaintiff-insured, who, prior to a business-interruption loss and by an exculpatory clause in a construction contract, released the contractor from liability for negligently causing the loss, is precluded from pursuing recovery upon a policy of "all-risk" insurance in force prior to the release on the ground that exculpation defeated defendant insurance companies' subrogation rights against the contractor. We hold that plaintiff is not thereby precluded from recovering under the policy and affirm the trial court's order.

Plaintiff, Great Northern Oil Company, owns and operates an oil refinery at Pine Bend in Dakota County, Minnesota. On August 12, 1964, plaintiff procured from the several defendants a 3-year policy of "all-risk" insurance covering, among other things, losses due to the interruption of plaintiff's business. The aggregate amount of coverage is $3,000,000. The insurance policy provided:

"(H) SUBROGATION. In the event of any payment under this policy the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after loss to prejudice such rights."

On February 7, 1967, during the term of the policy, plaintiff-insured entered into an agreement with the Litwin Corporation, Inc., for the construction of catalytic cracking expansion facilities, designed to materially increase plaintiff's production. So far as pertinent to the question presented, the construction agreement limited Litwin's liability for bodily injury and damage to plaintiff's property during construction and, by an exculpatory clause, provided that "Contractor shall not be responsible or held liable for any damages or liability for loss of use of the Work, loss of profits therefrom, or business interruption thereof however the same may be caused."

On June 16, 1967, a crane accident caused damage to the partially completed construction work. Plaintiff brought this action

against defendants-insurers, contending that the accident had caused it to suffer a substantial business-interruption loss for which defendants are responsible under the terms of the all-risk insurance policy. The defendants' joint answer generally denied that plaintiff had sustained any loss covered by the policy and further alleged that the insured could not recover under the policy because the insured, by releasing Litwin from liability before the accident occurred, had defeated the insurers' rights of subrogation under the policy. The parties made cross-motions for summary judgment on this latter claim, and the court granted plaintiff's motion, striking the foregoing specific defense. Defendants appeal. We affirm and hold that plaintiff, in the absence of a prohibition in the insurance contract against entering into any exculpatory agreements, is not precluded from pursuing its action to recover its loss under the insurance policy.

Subrogation is a normal incident of a contract of insurance. Aetna Life Ins. Co. v. Moses, 287 U. S. 530, 53 S. Ct. 231, 77 L. ed. 477. Its existence does not necessarily depend on the terms of the contract but on the nature of the contract of insurance and on general principles of equity. Bacich v. Homeland Ins. Co. 212 Minn. 375, 3 N. W. (2d) 665.

Whether or not the insurance policy expressly reserves subrogation rights, it is the universal rule that upon payment of a loss, an insurer is entitled to pursue those rights which the insured may have against a third party whose negligence or wrongful act caused the loss. See, Board of First Congregational Church v. Cream City Mutual Ins. Co. 255 Minn. 347, 96 N. W. (2d) 690. However, the insurer, as the subrogee, is entitled to no greater rights than those which the insured-subrogor possesses at the time the subrogee asserts the claim, as the subrogee merely "steps into the shoes" of the subrogor. Employers Lia. Assur. Corp. v. Morse, 261 Minn. 259, 263, 111 N. W. (2d) 620, 624. As an application of this rule, it is thus well established that an insured may defeat the insurance company's rights of subrogation by (1) settling with the wrongdoer after loss but before

payment of the insurance (e. g., Bacich v. Homeland Ins. Co. *supra;* Harter v. American Eagle Fire Ins. Co. [6 Cir.] 60 F. [2d] 245); (2) settling with the wrongdoer after payment under the policy (e. g., National Union Fire Ins. Co. v. Grimes, 278 Minn. 45, 153 N. W. [2d] 152); or (3) entering into an agreement of release with the wrongdoer before the policy is issued (e. g., Hartford Fire Ins. Co. v. Chicago, M. & St. P. Ry. Co. 175 U. S. 91, 20 S. Ct. 33, 44 L. ed. 84).

Unlike the foregoing examples, here plaintiff, by the construction contract (executed subsequent to the issuance of the policy but prior to loss), exonerated the contractor from any potential liability for damages resulting by way of business interruption, "however the same may be caused." The parties appear in agreement that this broad language includes damages caused by the contractor's own negligence. Cf. General Mills v. Goldman (8 Cir.) 184 F. (2d) 359. Such exculpatory agreements releasing a contracting party from liability caused by his own negligence are not uncommon in modern-day construction contracts. They are designed to distribute the burden or risks inherent in the performance of such contracts in such a way as to eliminate foreseeable disputes and to reduce the cost of construction.[2] Such agreements do not contravene public policy, are valid, and are enforceable. School Dist. No. 877 v. Loberg Plumbing & Heating Co. 266 Minn. 426, 123 N. W. (2d) 793.[3]

---

[2] Although it would not appear to be legally significant since no misrepresentation or fraud is claimed, the purpose of including the exculpatory clause in the construction contract does not appear in the record. Whether it was merely a part of a standard form of construction contract which the parties signed without careful consideration of its effect upon coverage under defendants' "all-risk" policy, or whether it was deliberately designed to shift liability for the loss which occurred to defendants under the provisions of the policy, as defendants contend, is not revealed by the record.

[3] Such allocations of loss were employed much earlier in landowner-tenant agreements and have consistently been upheld against claims that they violate public policy. See, General Mills v. Goldman (8 Cir.) 184 F. (2d) 359; Hardware Mutual Ins. Co. v. C. A. Snyder, Inc. (W. D.

Although there appears to be no case specifically so holding, we assume, as do the parties, that an unambiguous and broad exculpatory agreement of the type used in this case defeats the subrogation rights of the insurance company against the contractor even though it was made subsequent to the issuance of the policy and prior to loss.[4] Upon the assumption that subrogation rights are defeated by a release made after issuance of the policy and before loss, the question arises as to whether such impairment of subrogation rights should also preclude plaintiff from pursuing recovery under the all-risk insurance policy.

Treatises contain language which states generally that a re-

Pa.) 137 F. Supp. 812; Cerny-Pickas & Co. v. C. R. Jahn Co. 7 Ill. (2d) 393, 131 N. E. (2d) 100; Mayfair Fabrics v. Henley, 48 N. J. 483, 226 A. (2d) 602; Id. 97 N. J. Super. 116, 234 A. (2d) 503; United States Fire Ins. Co. v. Phil-Mar Corp. 166 Ohio St. 85, 139 N. E. (2d) 330. See, also, Hartford Fire Ins. Co. v. Chicago, M. & St. P. Ry. Co. 175 U. S. 91, 20 S. Ct. 33, 44 L. ed. 84.

[4] See, Continental Mfg. Corp. v. Underwriters at Lloyds London, 185 Cal. App. (2d) 545, 8 Cal. Rptr. 276, rehearing denied, 185 Cal. App. (2d) 556, 9 Cal. Rptr. 115. Defendants, in support of this position, as well as their contention on the issue presented, heavily rely on Continental Manufacturing. There, recovery on a policy of "Hull insurance" covering a leased airplane destroyed by the lessee's negligence was denied where an exculpatory clause in the lease, executed after issuance of the insurance policy and prior to loss, relieved the lessee from liability for negligence in flight. The issue in dispute involved an interpretation of the lease agreement. Whether the court, in determining that the parties intended to exonerate the lessee from liability for negligence, also held that the insurer's subrogation rights were defeated as well as the lessor's right to recover on the policy is difficult to discern because the matter was submitted upon stipulation, and as indicated by the court's denial of a petition for rehearing and the absence of any discussion of these questions, the parties may have agreed that if the lease were found to exculpate the lessee from liability, both the subrogation rights of the insurer and the lessor's right to recover under the insurance policy were destroyed. At most, the case may be authority for the proposition that an insured may defeat an insurer's subrogation rights prospectively.

lease of liability given to a tortfeasor by the insured bars the insured's right of action on the policy because it destroys the insurer's right of subrogation. 6 Appleman, Insurance Law and Practice, § 4093; 44 Am. Jur. (2d) Insurance, § 1839. However, analysis of the cases cited in support of the rule reveals that it was derived from cases in which defeat of the insurer's right of subrogation occurs after loss. E. g., Bacich v. Homeland Ins. Co. *supra.* Some of the cited cases have held that the insured is precluded from recovery on a policy where he has defeated the insurer's right of subrogation by an agreement made before loss. However, in all such cases the insurance policies provided expressly that relinquishment of the insured's rights against a potential wrongdoer rendered the policy void. Kennedy Brothers v. Iowa State Ins. Co. 119 Iowa 29, 91 N. W. 831; Fayerweather v. Phenix Ins. Co. 118 N. Y. 324, 23 N. E. 192; Southard v. Minneapolis, St. P. & S. S. M. Ry. Co. 60 Minn. 382, 62 N. W. 442, 619.

Defendants vigorously argue that an insured who, without reservation, releases all claims for damages against a potential wrongdoer either after or prior to loss, thereby defeating the right of subrogation accorded an insurer by the terms of an insurance policy, should be precluded from making recovery upon the policy for damage resulting from the wrongdoer's negligence. They argue that the insurer, prior to loss, has no way of preserving a remedy against the tortfeasor, and that commonsense suggests no basis for according any different treatment to an insured who has released a wrongdoer from liability before the loss occurs than to an insured who has released the wrongdoer after the loss occurs since, in either event, the insured has, by his own conduct, deprived the insurer of a valuable right afforded by the insurance contract—the right to recoup its loss from the one primarily liable. Defendants argue further that by permitting the contractor to avoid the risk of liability, plaintiff got its new facility at a lower cost, thereby receiving one benefit for relinquishing its claim against the contractor, and that plaintiff

now seeks the added benefit of compensation by defendant insurers. They contend that they undertook a defined risk—the indemnification of plaintiff from loss resulting from hazards encountered in the operation of a going refinery—but did not undertake the risk of providing liability insurance to third parties, and that plaintiff's action thereby imposed a new and different kind of risk on the insurer. Defendants insist that if Litwin Corporation and plaintiff intended to place the risk of loss from delay in the commencement of the operation of the new facilities on the defendants, they could have secured the consent of defendants to the relinquishment of their subrogation rights, affording them the opportunity to evaluate the risk, to specifically include it in the insurance policy, and to assess any added premium cost to plaintiff.

These arguments are not without merit. While we are not free from doubt as to the resolution of the question presented, we are persuaded that considerations of public policy and equitable principles do not restrict our upholding the trial court's disposition. Surely, the considerations of public policy have been put to rest in the numerous cases upholding the validity of exculpatory provisions exonerating a party from liability for damages resulting from his own negligence. The important considerations are the equities between the parties. We believe on balance they fall on the side of the plaintiff-insured. The all-risk insurance policy, as its characterization implies, insured all real and personal property of plaintiff against all hazards encountered in the operation of a refinery, expressly including loss directly resulting from necessary business interruptions caused by any damage to the plaintiff's property. It contained a number of exclusions for which coverage was not provided as well as limiting provisions, including the subrogation clause quoted above. While exemplary fair dealing should have prompted plaintiff to notify defendants of the increased hazards occasioned by new construction activities on its premises, there appears no persuasive reason why defendants, at the time the policy was written,

could not have expressly prohibited plaintiff from entering into any agreements prospectively releasing third parties, whose presence on plaintiff's premises was surely foreseeable, from liability for damage caused by their negligence. Defendants' argument that the policy was not intended to provide liability insurance coverage to negligent third parties is not persuasive, since the hazard of damage to plaintiff's property and resultant business interruption by either its own or a third party's negligence was surely one which was covered and reflected in the premium charged plaintiff.

Upon this record, the argument that a construction company's presence on plaintiff's premises would have increased the risk covered by the policy is speculative; even more speculative is the argument that a greater premium would have been assessed for such specific coverage. Thus, to allow plaintiff to pursue its recovery under the all-risk policy inflicts no injustice on defendants because the insured has paid for the hazard covered by the policy and has, as defendants acknowledge, the right to negotiate for and enter into construction contracts and to promote its business interests by avoiding overlapping insurance coverage against hazards inherent in the operation as well as the repair and expansion of its facilities. Plaintiff is seeking to recover only what it had a right to assume it paid the defendants a premium to insure against. While the action of plaintiff in releasing the contractor may have been unintentional or unwitting, defendants had the greater opportunity to prohibit such action by exercising their right to vary the coverage under the policy by endorsements as they deemed necessary.[5]

---

[5] The action may have been no more deliberate or intentional than that of an owner of an automobile who, as a consideration for renting a garage, exculpates the garage owner from any liability for loss of the automobile, and who, subsequently suffering loss of the vehicle resulting from the garage owner's negligent failure to keep the garage door locked, quite naturally would assume that he would recoup his loss under the insurance policy covering his automobile. Although mindful that the wrongdoer does not escape liability, were we to hold under

Affirmed.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.

this hypothetical as defendants urge, we would have to unrealistically assume that exoneration of the garage owner from prospective liability would so increase the risks covered by the policy and the premium therefor as to justify imposing on the automobile owner the burden of informing his insurance carrier of his action or suffer loss of coverage for a risk expressly included in the insurance contract.